

September 25, 2020

Hon. Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

              Re:      <u>United States v. Ramon Lizardi, 11-CR-1032-55 (PAE)</u>

Dear Judge Engelmayer:

On August 26, 2020, the Court received a *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) from Ramon Lizardi, which followed the denial of his administrative request for relief from within his institution.[1] On August 27, the Court appointed me to represent Mr. Lizardi in connection with his motion. For the reasons that follow, I respectfully urge the Court to grant Mr. Lizardi's motion for compassionate release and to order his immediate release.

### A. Introduction

Ramon Lazardi was arrested on January 16, 2013 for his participation in a racketeering enterprise, namely the Bronx Trinitarios Gang (BTG). *See* Pre-Sentence Report (PSR), Exhibit F, at p. 3; ¶¶ 1-4.[2] Mr. Lizardi was detained at his arraignment, and has remained incarcerated ever since. On April 16, 2014, Mr. Lizardi pled guilty to a superseding information, charging him with racketeering conspiracy and engaging in the activities of the racketeering enterprise between 2004 and 2006, including his participation in the murder of Miguel Perez in 2005. The government agreed that a four-point minimal role reduction was appropriate for Mr. Lizardi's role in the murder. *Id.* at ¶ 4. On December 17, 2014, the Court imposed a prison term of 121 months, the bottom of the applicable guideline range. *See* ECF No. 1570 (Judgment).

Mr. Lizardi has now served 92 months of that 121 month sentence. Because of credit for good time, he is scheduled to be released (according to the www.bop.gov website) on

---

[1] *See* ECF Doc. No. 2513, Exhibits C, D. Moreover, Mr. Lizardi recently received notice from the BOP Regional Office, denying his appeal of the Warden's decision. Accordingly, the administrative exhaustion requirement of the statute has been met and this motion is timely.

[2] Exhibit numbers continue from where they left off in Mr. Lizardi's *pro se* petition. Moreover, the PSR will be redacted in the public filing of this memorandum.

September 11, 2021. Moreover, Mr. Lizardi has been told by his case manager that he will be released to a half-way house on March 15, 2021. Accordingly, Mr. Lizardi has completed the vast majority of his sentence and is likely to be released, even under normal conditions, in the spring of 2021.

Yet, as the Court is well aware, current conditions are anything but normal. There has been an unprecedented change of circumstances that could not have been foreseen at the time of sentencing. The COVID-19 pandemic, as well as the dangerous conditions for its spread within prisons, now pose an extraordinary and perhaps lethal risk to Mr. Lizardi's health. Public health experts unanimously agree that the virus thrives in densely packed populations and is especially aggravated in unsanitary conditions where people are unable to practice social distancing, proper hand-washing, and sanitizing. In the short time since reporting its first COVID-19 infection, the BOP has seen an explosion of cases among inmates and staff.

Although Mr. Lizardi is fortunate enough not currently to suffer from any underlying medical conditions that is known to increase the severity of the virus, the mere fact of his confinement in a correctional institution exacerbates the likelihood that he will catch the virus, which, as we all know, carries with it grave risks.

These changed circumstances, combined with Mr. Lizardi's commendable efforts at rehabilitation, are "extraordinary and compelling" so as to warrant compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and modification of his original sentence. The changed circumstances also materially alter the balance of the 18 U.S.C. § 3553(a) factors, which this Court is to consider anew in the context of an application for compassionate release. While Mr. Lizardi's crime remains as serious as the Court deemed it in 2014, keeping him in prison for a few extra months in conditions that potentially jeopardize his life is a punishment this Court surely never intended to impose, and is far "greater than necessary" to achieve the purposes of sentencing. *See* 18 U.S.C. § 3553(a). Mr. Lizardi has a concrete plan for reintegration into society, which includes returning to the home he shared with his sister and her family in the Bronx. *See* PSR at ¶ 167. Allowing Mr. Lizardi to finish out his sentence at home is the prudent and humane response to the risks created by the novel coronavirus.

### B. COVID-19 Presents Extraordinary and Compelling Circumstances

At this point in time, the Court is well aware of the dangers associated with the coronavirus epidemic, and its particular impact on prison populations. As the Court has stated itself:

> The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration. The crowded nature of federal prisons presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread. For these reasons, in the past several months, numerous courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody and, in more limited instances, the compassionate release of inmates serving federal sentences.

*United States v. Benjamin*, 15-Cr-445(15) (PAE) (Sept. 15, 2020), ECF Doc. 1144, at 4 (Decision granting compassionate release).

Indeed, the COVID virus has gained entry into Fort Dix FCI, the correctional facility where Ramon Lizardi is incarcerated. According to the BOP's own website, COVID tests were performed on 455 inmates (out of a jail population of 2356), with 34 inmates testing positive for the virus. The site also states, at a different location, that there is currently one positive inmate at Ft. Dix, while 36 inmates and 6 staff have recovered. *See* https://www.bop.gov/coronavirus/ .[3] Moreover, Mr. Lizardi reports that as of September 24, a medical staff member just tested positive, and there is a plan to transfer inmates from Elkton FCI to Fort Dix on Monday, September 28. Elkton, as the Court may know, has been the site of one of the worst COVID outbreaks in the country. According to the BOP website, over 950 inmates tested positive there, and 9 died of the virus. *Id. See also* https://www.fox19.com/2020/07/15/more-than-covid-cases-ohio-federal-prison-health-officials-say/. The introduction of inmates from Elkton FCI would further increase the risks to those incarcerated at Fort Dix.

At Fort Dix, Mr. Lizardi lives in a 12-man room, with inmates sleeping in six bunk beds less than 4 feet from each other. It is impossible for Mr. Lizardi to take the most basic precautions, such as social distancing. He is deeply afraid that it is only a matter of time until the virus reaches his room and dorm through an infected staff member or inmate.

As the Second Circuit held just today,

> the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.

*United States v. Zullo*, __ F.3d __ (2nd Cir. Sept. 25, 2020), 19-3218-cr at 18. In light of the circumstances described above, the Court should join other courts in the Southern District and deem the dire threat posed by the coronavirus to those in prison, especially to those incarcerated in facilities where the virus has taken hold, to be "extraordinary and compelling" under 18 U.S.C. § 3582(c)(1)(A)(i). *See e.g. United States v. Ozols*, No. 16-Cr-692 (JMF) at 2 (SDNY June 2, 2020) ("as numerous courts have concluded, the threat of COVID-19 to those in prison constitutes an extraordinary and compelling reason for compassionate release."); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("As this Court has explained, the COVID-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals.").

While an initial wave of compassionate release applications properly focused on those inmates who are elderly or have critical health problems, it has not been enough. As has been recognized by policy makers and courts, the urgent and unprecedented national emergency facing our country requires that the prison population be reduced as much as possible, in a manner consistent with public safety. *See e.g.* Joint Statement from Elected Prosecutors on

---

[3] Like much about the BOP, this incongruence is puzzling. If 34 inmates tested positive, how could 36 have recovered?

Covid-19 and Addressing the Rights and Needs of Those in Custody (Mar. 25, 2020), https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf (joint letter issued by District Attorneys' offices across the country arguing that because prisons can "become breeding grounds for the coronavirus," it is crucial to "work together to implement concrete steps in the near-term to dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks."); Memorandum from the Attorney General to the Director of the Bureau of Prisons re: Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.  It is vital that the BOP – and where it fails to do so, the courts – modify the sentences of other inmates as well.  Mr. Lizardi, who has served more than 90% of his sentence, who poses no threat to the community, is precisely the sort of inmate who merits release, and must be released if the goal of substantially reducing the risk of infection in the prisons and surrounding communities is to be achieved.

### C. **The 18 U.S.C. § 3553(a) Factors Weigh in Favor of Release**

A court may "reduce the term of imprisonment" after finding that "extraordinary and compelling reasons warrant such a reduction" and taking into account "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A)).  The legislative purpose of § 3582(c) was to create "safety valves for modification of sentences" and Congress contemplated that the decision of whether "there is justification for reducing a term of imprisonment" would reside with the sentencing court, given that the traditional body that would consider such modification – a parole board – had been abolished in the federal system.  S. Rep. No. 98-225, at 56, 121 (1983).

Given the present circumstances, releasing Mr. Lizardi a few months before his scheduled release date would be consistent with the sentencing imperatives in 18 U.S.C. § 3553(a).  For example, the public no longer needs to be protected from Mr. Lizardi, and it has not needed that protection for a long time.  In 2007, when he was released from prison for a state offense, Mr. Lizardi renounced his gang membership, criminal activity as a whole, and commenced a life devoted to work and family – for more than five years before his arrest on this case. All parties conceded this unusual turn away from crime,[4] and it played a significant role in the Court's consideration of the § 3553(a) factors:

> For the same reason the Section 3553(a) factor, the 3553(a) interest in what is called incapacitation or public protection, is modest. I cannot say, given the crimes that you have committed, that you will pose no -- zero -- risk to the public when your term of incarceration ends. But, given that you lived peaceably in society for some five years leading up to your arrest in this case, the risk to society by your being at liberty is far less, again, than the risk presented by the release of other former Trinitarios members. So, I give that factor limited weight in my analysis.

Sentence Transcript at 39, ECF Doc. No 1600.

---

[4] *See* Sentencing Transcript, at 20-21, ECF Doc. No. 1600.

Miedel & Mysliwiec • 80 Broad Street, Suite 1900 • New York, New York 10004 • (T) 212-616-3042 • (F) 800-507-8507 • www.fmamlaw.com

For seven years prior to sentencing, Mr. Lizardi had demonstrated to the Court that he was on a righteous path, worked hard, and was committed to full rehabilitation. Despite Mr. Lizardi's violent activities between 2004 and 2006, the Court imposed a bottom of the guidelines sentence because it recognized the great strides Mr. Lizardi had made to right his life. *Id.*at 44; *see also* ECF Doc. No. 1411 (Lizardi Sentencing memorandum, and attached exhibits, including social history report).

Ramon Lizardi has continued his rehabilitative efforts since his incarceration in January 2013. He obtained his GED at the MCC in 2013, and has continuously taken classes offered in the BOP. *See* Exhibit G, Lizardi BOP Progress Report. Although Mr. Lizardi received four disciplinary write-ups during the course of nearly 8 years of incarceration,[5] they appear to have been for minor infractions, and the BOP rates his "institutional adjustment [as] favorable." *Id.* at 2. He has also maintained work assignments throughout his time in the BOP, and "has consistently earned average or above average work evaluations during this period of incarceration." *Id.* at 1.

Prison is hard, especially for a former gang member who is trying to stay on the straight and narrow. Mr. Lizardi has succeeded where many others have failed. He has made the most out of his time in prison, has kept his eye on the prize, and has prepared himself both emotionally and practically for his reintegration into society.

Fortunately, Mr. Lizardi has the family support to aid him in that process. For the years before his arrest, Mr. Lizardi lived with his older sister, Francheska, in the Bronx. She was a single mom, and he, having no kids of his own, helped raise her daughter. As the Court acknowledged at sentencing, Francheska wrote a moving and compelling letter to the Court on behalf of her brother detailing the innumerable ways in which he helped and supported her. *See* Sentence Transcript at 43-44, ECF Doc. No 1600. The letter is worth reading again, and it is attached as Exhibit H. Mr. Lizardi was also very close with his older sister Kayla. Indeed, he served as an invaluable support system in her struggle to raise her son, who was born with brain damage that prevented him from eating or walking on his own. Until his tragic death in 2014, her son required care around the clock, which Mr. Lizardi frequently provided. *See* Sentence Transcript at 42, ECF Doc. No 1600.

Mr. Lizardi was always there for his two sisters and their kids before his arrest, and they are here for him now. When he is released, he will return to live with Francheska and her daughter at the same apartment in the Bronx where the family has lived for decades. He is determined to obtain his CDL license and to find work in commercial trucking in order to support both himself, and to provide financial support to his family. The variety of classes he has taken inside the BOP have inspired him to continue his education on the outside, and Mr.

---

[5] As the Court is undoubtedly aware, avoiding disciplinary write-ups entirely while in prison is exceedingly difficult, just given the sheer number of rules and regulations that must be followed, as well as the power imbalance and discretion guards have over inmates that can result in a "shot" for miniscule offenses, perceived or real, from some guards and not others. The important take-away from Mr. Lizardi's disciplinary record is the fact that there are no allegations of violence, drugs, or other serious misconduct, and he has not been docked any good time.

Lizardi is committed to further educate himself in his effort to rejoin society as a productive member.

      In sentencing Mr. Lizardi nearly six years ago, the Court weighed his violent past against his demonstrated efforts to change his life in the years prior to his arrest, concluding that a sentence at the bottom of the guideline range was reasonable under 18 U.S.C. § 3553(a). But we are now at a different stage, with a whole host of new facts and circumstances to consider, including the misery Mr. Lizardi has had to endure since March, including lockdowns, strict confinement, fear, and anxiety.  I am not asking the Court to substantially reduce Mr. Lizardi's sentence.  I am asking for him to be released a few months before his scheduled release date to (1) prevent the possibility of him contracting COVID-19 due to the increased risks present in correctional institutions, and (2) because the § 3553(a) factors now weigh heavily in favor of release.  While six months or so may not seem like much, the possibility of a "second wave" of COVID infections sweeping the country is real, and will, once again, most directly impact those in confined spaces, such as prisons.  *See e.g.* https://www.washingtonpost.com/health/coronavirus-fall-projections-second-wave/2020/09/04/6edb3392-ed61-11ea-99a1-71343d03bc29_story.html   It is hard to see what societal interests could be served by insisting that Mr. Lizardi finish the last few months of his sentence in light of the very real risks he faces, and the very real benefits he could offer to his family if released.

      For these reasons, I respectfully urge the Court to grant Mr. Lizardi's motion for compassionate release.

      Thank you very much for your consideration.

                                        Respectfully submitted,

                                        /s/

                                        Florian Miedel
                                        *Attorney for Ramon Lizardi*


cc:    AUSA Marguerite Colson (ECF)
        Clerk of Court (ECF)